# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOSEPH MATERIA** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-2251(RWR) |
| ) | |
| **ELAINE L. CHAO, SECRETARY** ) | |
| **UNITED STATES DEPARTMENT** ) | |
| **OF LABOR** ) | |
| ) | |
| Defendant. ) | |

## FIRST AMENDED COMPLAINT

1. Joseph Materia brings this action for injunctive relief and damages based on the denial of his rights under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991 (hereafter "Title VII"). The Department of Labor ("DOL"), and/or its agents acting on its behalf, subjected Mr. Materia to sex discrimination, *quid pro quo* sexual harassment, a hostile work environment and retaliation.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1343(a)(3), and 1343(a)(4) and 42 U.S.C. § 2000e-5.

3. Pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 2000e-5(f)(3), venue is proper in the District of Columbia because the claims asserted herein arose in the District of Columbia which is also the location of the acts relevant to the claims asserted by Mr. Materia; the location where Defendant has its principal office and where,

upon information and belief, the employment records relevant to the Complaint are located.

## **PARTIES**

4. Joseph Materia (hereafter "Mr. Materia" or "Plaintiff Materia") is currently a Veterans Program Specialist, GS-11, stationed in Washington, D.C. Prior to his employment with DOL, Mr. Materia served as the State Quartermaster of Massachusetts for approximately five months assisting the National Guard. Mr. Materia has approximately thirty (30) years of military service and is a graduate of West Point. He achieved the rank of Colonel before his retirement in 2004.

5. Defendant Elaine Chao is the Secretary for the United States Department of Labor. The Secretary is being sued in her official capacity as provided by law based on her executive responsibility for administering DOL personnel policies and her responsibility to enforce and to promote equal employment opportunity throughout the DOL. During the relevant time period, the DOL has employed over 500 employees.

6. Kathleen Summers is not a defendant in this lawsuit but was named in Mr. Materia's EEO complaint as a discriminatory official. Ms. Summers is the Regional Leader for the DOL Northeast Region and is Mr. Materia's third-line supervisor. Ms. Summers is the management official most directly involved in impeding Mr. Materia's career from advancing by demanding sexual favors in exchange for career advancement. Ms. Summers also subjected Mr. Materia to *quid pro quo* sexual harassment and created a hostile work environment.

## FACTS

7.  The averments set forth in paragraphs 1 through 6 are adopted and incorporated herein by reference.

8.  Mr. Materia began working for the Department of Labor in the Boston office as a Veterans Program Specialist (GS-9-3001).   His direct supervisor was Barbara Thompson.   Mr. Materia's duties were to provide administrative support to regional veterans' training programs in the Northeast region.

9.  In or about December 2004, Mr. Materia's supervisor, Ms. Thompson, introduced him to his third-line supervisor, Ms. Summers.  Ms. Thompson embarrassed Mr. Materia when she bluntly suggested that Mr. Materia would be a good escort for Ms. Summers' parties and official affairs.  Ms. Thompson then informed Mr. Materia of Ms. Summers' status within DOL and that she was a good connection. Ms. Summers had an office down the hall, was a Presidential appointee and held the highest ranking DOL position within the Northeast region.

10. In or about January 2005, Ms. Thompson informed Mr. Materia that he would be assuming new responsibilities for a VETS program (HireVetsFirst) for the regional office and was instructed to accompany Ms. Summers on a business trip to Nashua, New Hampshire.  This trip to New Hampshire was Mr. Materia's first official duty as a VETS program coordinator.   Ms. Summers contacted Mr. Materia and told him that it would be best for them to drive to New Hampshire together.   Naively, and not wanting to reject her request, he acquiesced and agreed.

11. Shortly thereafter, Mr. Materia and Ms. Summers traveled to New Hampshire together. On the return to Boston, Ms. Summers pulled into a restaurant and informed Mr. Materia that they were having a special, late lunch together. Ms. Summers made Mr. Materia extremely uncomfortable and he felt he could not decline the invitation. Moreover, Ms. Summers informed Mr. Materia that she was in charge of the regional office and that a late lunch together was not a choice. During lunch, Ms. Summers informed Mr. Materia that she was very attracted to him and that she wanted to get to know him. Shocked at her revelation, Mr. Materia told Ms. Summers that he had had a recent divorce, had a son in Iraq and did not desire a relationship with her. He also impressed upon her his discomfort about a relationship at work. Ms. Summers insisted and assured him that there would be no problems if they had a personal relationship.

12. Shortly thereafter, feeling as if he had no other choice, and given her rank within the regional office, Mr. Materia reluctantly agreed to go to a movie with Ms. Summers. During the movie, Ms. Summers grabbed Mr. Materia's hand, kissed him and rubbed his leg, much to his chagrin, but again, he was afraid to reject her. Ms. Summers then proposed that she and Mr. Materia spend the night together. Mr. Materia, shocked, declined.

13. Thereafter, Ms. Summers began a frequent pattern of visiting Mr. Materia at work and sending him e-mails and text messages expressing her amorous feelings for him. She started to call him frequently, both at work and after duty hours. She left tokens of her affections on his desk which his co-workers began to notice and gossip about with other employees. Mr. Materia was extremely uncomfortable

with her romantic overtures and informed her that her behavior was unwelcome. He also expressed his concern over how she acted when they went to the movie together.  Mr. Materia informed Ms. Summers that he did not want her to leave gifts on his desk and that it was causing problems with his co-workers. Nonetheless, Ms. Summers would not be deterred.  She expressed her opinion that she did not think much of Mr. Materia's supervisors and she would be the one that he needed to trust for promotion and career growth.

14. In mid January 2005, Ms. Thompson assigned Mr. Materia a weekend duty trip to Vermont.  Mr. Materia was instructed to provide readiness briefings to soldiers who were being activated.  Surprised by the assignment, Mr. Materia nonetheless agreed to the weekend travel.  Ms. Summers then contacted Mr. Materia and told him that she had requested that these duties be given to him because she had a residence for skiing in Vermont and wanted him to join her for some skiing.  Mr. Materia politely declined.  Not to be deterred, Ms. Summers informed Mr. Materia that she would be accompanying him to the briefings.  Mr. Materia was extremely uncomfortable about the situation and informed his supervisor, Ms Thompson.  She did not react with concern and informed Mr. Materia that she was well aware that Ms. Summers would be attending the briefings with him.

15. Following instructions, Mr. Materia traveled to Vermont for the assignment.  True to her word, Ms. Summers attended the briefings and insisted she and Mr. Materia have lunch and dinner together.  Again, feeling that he had no choice, Mr. Materia agreed to dinner.  After dinner, Ms. Summers kissed Mr. Materia and again asked him to spend the night with her.  Even though he was afraid to say no, he declined

and once again informed her that he was not interested in a romantic relationship with her.

16. Upon Mr. Materia's return to Boston, Mr. Materia's colleagues, namely Tina Beech, Eileen Woods and Paul Desmond, felt that Mr. Materia's assignment to Vermont was quite unusual and teased Mr. Materia repeatedly about the trip. Mr. Materia informed Ms. Thompson that Ms. Summers had attended his briefings, that the assignment went well, but that he felt awkward and uncomfortable being assigned to work with Ms. Summers. She quickly reminded Mr. Materia of Ms Summers' position with DOL and rationalized Ms. Summers' behavior.

17. In or around February 2005, Ms. Summers continued to harass Mr. Materia and tried to pressure him into dating her. She called him continuously, leaving numerous messages and e-mails. She repeatedly visited his office and left gifts and candy on his desk. Although Mr. Materia asked her to discontinue this behavior, she would not. In fact, his protests seemed to make him all the more alluring to Ms. Summers. Whenever she had the opportunity, she would touch Mr. Materia's leg, shoulder, arm or hand. Mr. Materia asked her to stop. She agreed that she would but, in the same breath, she told Mr. Materia that she was a very important and influential woman and that she could affect his career.

18. Mr. Materia feared for his career. In order to avoid Ms. Summers without appearing obvious, he began turning his cell phone off at night. He was afraid to answer phone calls at work. He answered her e-mails briefly and politely, all the while remembering her not-so-veiled threat of affecting his career advancement.

19. In or around March 2005, in an effort to escape Ms. Summers, Mr. Materia notified his supervisors, Ms. Thompson and David Houle, DOL Regional Administrator, that he was seeking appointment to become Adjutant General of Massachusetts. This was a military position as a general officer and he requested their support. Mr. Houle was very supportive and offered a letter of recommendation from the Agency. He also informed Mr. Materia that hiring him was the best decision he made in 2004 and secured a letter from the Agency's second-in-command, John McWilliam.

20. In or about March 2005, Ms. Summers contacted Mr. Materia and told him that she had to see him in her office for an important matter. Ms. Summers told Mr. Materia that she had heard about his efforts to receive DOL support for the military position, that she had already contacted Governor Romney's office and she would be involved in the selection process. The appointment was a political appointment by the Governor and she informed Mr. Materia that her prior political campaign experience and connections were essential for his appointment to position. She informed Mr. Materia that he would have to work with her for the appointment and for his related career within DOL. Mr. Materia, desperate to leave the increasingly hostile environment he was in, felt compelled to cooperate with her.

21. Ms. Summers, under the pretext that it had to do with the gubernatorial appointment, called Mr. Materia to her office frequently. She would close the door, under the pretext of confidentiality, and would grab Mr. Materia's hand and

try to embrace him.   Although Mr. Materia would ask her to stop this behavior, she would not.

22. In or about early April 2005, Ms. Summers asked Mr. Materia to accompany her to a political gathering where the Governor would be in attendance.  She told Mr. Materia that it was essential for him to attend to promote his request for a political appointment.  She informed Mr. Materia that she wanted to introduce him to the Governor's staff and to some people whom she said would be offering recommendations to the Governor. Although Mr. Materia attended the gathering, he was extremely embarrassed by Ms. Summers' unwelcome behavior.  She introduced him to some of the attendees as her "boyfriend."  Mortified, Mr. Materia asked her to stop.  Undeterred, Ms. Summers asked him if he wanted to spend the night with her.  He declined although he feared what type of impact this would have on his appointment.

23. On or about April 10, 2005, Ms. Thompson informed Mr. Materia that he was required to pick up Mr. McWilliam at the airport after work one evening and to drive him to a conference that he would be attending.  Mr. Materia contacted Mr. McWilliam and they agreed to find tickets for a baseball game after the conference.  Ms. Summers found out that Mr. Materia was going to pick up Mr. McWilliam and attend a ballgame.  She informed him that she already had two tickets they could use and would meet them at the ballpark with the tickets.

24. On or about April 13, 2005, Ms. Summers met Mr. Materia and Mr. McWilliam at Fenway Park under the pretext of bringing the baseball tickets.  To his dismay, she arrived with a girlfriend in tow, much like they were on a double date.  She

indicated that the tickets were several hundred dollars. Although Mr. Materia immediately asked to repay the money, she privately informed him that he didn't owe her and that she would not accept money. During the game, Ms. Summers changed seats to sit next to Mr. Materia and tried several times to rub his leg, arm and hold his hand. He begged her stop. Mr. Materia found the attention embarrassing and was extremely uncomfortable especially with Mr. McWilliam present.

25. That same evening, Mr. Materia informed Mr. McWilliam that he was not involved with Ms. Summers, that she made his work environment extremely uncomfortable and hostile. He expressed his desperate need to get out of the regional office. Mr. McWilliam told Mr. Materia that he would help him and discussed transferring him from the regional office and moving to DOL's main office in Washington, DC.

26. Shortly thereafter, Ms. Summers came into Mr. Materia's office and told him that it was critical that he accompany her to meet someone involved in the selection process for the Adjutant General position after work that evening. Mr. Materia declined because he was going to spend time with his daughter. She told him that it was very important because the person they were going to meet would be personally involved with the selection and needed to see him.

27. Desperate for a way out of the regional office, Mr. Materia agreed to go with Ms. Summers. As they pulled up to the Marriott Custom House in Boston, Mr. Materia immediately questioned Ms. Summers about what they were doing at a hotel. She assured him that he needed to trust her. He followed her up to a room

in one of the upper floors. She opened the door of the room and announced that she was the person who would interview him that evening and that she would be personally involved with the final selection as well as his future with DOL. She told Mr. Materia that he had to spend this time with her if he was to be successful. She had bathrobes folded on the chairs, flowers, food, music and soft drinks.

28. Mr. Materia was shocked and visibly upset. Ms. Summers became angry and told him how much she spent on the room and that he had better realize how important this was to her. Fortunately for Mr. Materia, they were interrupted by an important phone call and Mr. Materia made it clear that he could not stay. Ms. Summers asked him not to share the events of the evening and dropped him off at the train station. She did, however, ask him again to spend the night. Again, he declined.

29. The following morning, Ms. Summers went into Mr. Materia's office and placed the large bouquet of flowers from the previous evening on his desk. In a loud voice, she thanked him for a "special night" that could be heard by his co-workers, tarnishing his reputation once again. Mr. Materia's colleagues were quite surprised and asked him if he had spent the night with her. Horrified, he denied any relationship with Ms. Summers. This was not the first time Ms. Summers attempted to lead others into thinking that he was her lover.

30. That same day, Ms. Thompson called Mr. Materia into her office. He shared his fears of Ms. Summers, how she was interested in him and that Ms. Summers created a hostile work environment. Rather than taking steps to stop Ms.

Summer's inappropriate behavior, she downplayed the situation and told Mr. Materia that she did not think it was a serious situation.

31. On or about April 23, 2005, Ms. Summers called Mr. Materia to tell him that he would be appointed to the Adjutant General position and that he owed the appointment to her efforts. She indicated that he would personally be indebted to her.

32. That same day, only a few hours later, Governor Romney appointed another candidate to the Adjutant General position. Mr. Materia's credentials were far more superior to those of the selectee. When the appointment was made public, Ms. Summers called Mr. Materia to tell him that he had finished as a top finalist and that he owed her for that. She then told him that, if he wanted to get promoted within DOL, she was the key.

33. Ms. Summers continued to approach Mr. Materia at work. She constantly called him and e-mailed him. She often talked about work assignments and promotional opportunities. She asked Mr. Materia if he wanted to be assigned to her office but he declined. He dreaded her calls and suffered great anxiety. He told her that he could not speak to her because of his workload or that his cell phone was not charged. He wanted to appear to be able to handle this situation at work and did not want to tarnish his professional reputation with his colleagues. He feared antagonizing Ms. Summers or his supervisors and did not know what to do to get out of the situation.

34. In or about late April 2005, Mr. Materia contacted Mr. McWilliam and requested a transfer out of the regional office. Desperate to get out of the office, Mr. Materia

volunteered to relocate to Washington, D.C. to work on a new DOL program to help severely injured service members. Mr. McWilliam invited him to come to Washington, D.C. for a tour of Walter Reed Medical Center.

35. Shortly thereafter, in or about May 2005, Mr. Materia met with Chick Ciccolella and Mr. McWilliam. They offered him the position in Washington, D.C. Ecstatic, Mr. Materia accepted the assignment.

36. Upon his return to the regional office, Ms. Summers approached him about his new assignment. She claimed to have spoken to Mr. Ciccolella on his behalf. She indicated that he had to thank her for being selected for the position and that he would have to work with her in order to leave the regional office and get promoted. She told him that she was coordinating everything and that she wanted to see him when he arrived in Washington because she traveled there frequently. Alarmed, but dumbfounded, Mr. Materia said nothing.

37. In or around May 2005, Ms. Thompson detailed Mr. Materia to work on a special event that was supervised by Ms. Summers. It was a conference at Gillette Stadium hosted by Ms. Summers. During this event, Ms. Summers approached Mr. Materia several times in the afternoon and rubbed his arm and leg. She also tried to kiss him in a public hallway. Afraid that he would not get the new assignment in Washington, but more afraid for his reputation, Mr. Materia told her to stop.

38. In or around June 2005, Ms. Summers continued to contact Mr. Materia despite the fact that he asked her not to. She made unwelcome demands that Mr. Materia go on dates with her under the pretext of discussing his potential new assignment

in Washington with him.  During this time period, she also demanded that Mr. Materia attend her birthday party.  Mr. Materia attended under the belief that DOL staff would be present and was afraid that if he did not agree to make an appearance, he would jeopardize his career at DOL.

39. Mr. Materia's colleagues openly taunted him regarding Ms. Summers' obvious advances towards him and her undying interest in his career.  Furthermore, Ms. Thompson, resentful of the special attention he received from Ms. Summers and his complaints, threatened him with a written warning for no apparent reason which he refused to sign.

40. Ms. Thompson, in an effort to humiliate Mr. Materia, gave him demeaning errands to run such as picking up coffee or lunch.  Mr. Materia endured the hostility with the hopes he would be reassigned to the position in Washington, D.C.

41. In or around June 2005, Mr. Materia was enrolled in a class for Uniformed Services Employment and Reemployment Rights Act ("USERRA") investigations in Colorado.  He hoped this would enhance his career and help him get a new position within the DOL.  Ms. Thompson suddenly cancelled his enrollment.

42. In or around August 2005, the Agency assigned Mr. Materia to a position in Washington, D.C. for ninety days. Ms. Summers informed Mr. Materia that he needed to depend on her assistance for a permanent assignment and promotion.

43. In or around September 2005, Ms. Summers continued to harass Mr. Materia despite the fact he was relocated in Washington.  She continued to call and e-mail him, despite his requests that she discontinue this behavior.    She even

unexpectedly showed up at his office in Washington and again reiterated that he needed to rely on her for permanent orders and a promotion.

44. In or around October 2005, Ms. Summers again visited Washington, D.C. and demanded that Mr. Materia meet with him. Sensing his hesitation, Ms. Summers assured him that the meeting was business related. Not knowing what else to do, and not wanting to jeopardize his precarious position at the Agency, Mr. Materia agreed to meet with her.

45. On or about November 18, 2005, the Agency failed to promote Mr. Materia to a GS-11 position despite assurances from his supervisors that he would be promoted. The Agency gave no reason for the decision.

46. Shortly thereafter, Ms Summers contacted Mr. Materia and informed him that she was involved with his promotion.

47. Seeking answers and help with his situation, Mr. Materia confided his concerns about his career with a more senior DOL colleague, Angel Alvarez. After contacting the regional office on Mr. Materia's behalf, Mr. Alvarez became extremely distant and abrasive.

48. In or around December 2005, Ms. Summers continued to contact Mr. Materia and informed him that she was involved with his promotion delay and permanent orders.

49. Due to the stress directly related to Ms. Summers' constant harassment and his fears concerning his DOL career, Mr. Materia experienced atrial fibrillation. His pulse was irregular and he suffered from lightheadedness, fatigue, shortness of breath, sweating and chest pain. His doctor fitted him with a heart monitor and

prescribed coumadin.  Mr. Materia also had to have weekly blood testing and stress testing.  Mr. Materia's blood pressure was also elevated and his cardiologist prescribed coreg.

50. In or around December 2005, Ms. Summers invited Mr. Materia for an evening at the White House under the guise of meeting a contact at the White House that might be interested in helping a new program that Mr. Materia was managing. Afraid for his future, Mr. Materia agreed and brought a gift as instructed.  Not surprisingly, there was no meeting planned and this was yet another pretext by Ms. Summers to meet with Mr. Materia under the guise of a work gathering.

51. Also, in or around December 2005, Mr. Materia had growing concerns about the volatility of his assignment in Washington, D.C.  He was also highly embarrassed when Mr. Alvarez discussed that he missed a promotion at a department meeting where the agency director of operations, Gordon Burke, was present.

52. Subsequently, Mr. Burke and Mr. Materia had lunch together.  Mr. Burke asked Mr. Materia to consider working directly for him and mentioned an open position as the Transition Assistance Program ("TAP") director.  Mr. Materia accepted the position right away.  Mr. Burke told him to contact Mr. McWilliam to tell him he wanted the position, which he immediately did.

53. In or around January 2006, Mr. Materia met with Mr. Burke again.  In a complete turnaround from their previous conversations, Mr. Burke told Mr. Materia that he would not be considered for the job and personally recommended that he leave DOL.  Although he did not discuss specifics, he told Mr. Materia that, despite his outstanding credentials, he would not advance in the Agency.

54. In or around February 2006, the Agency promoted Mr. Materia to a GS-11 but did not make the promotion date retroactive.  The regional office informed Mr. Materia that there was no reason for the delay.

55. On or about February 14, 2006, Ms. Summers expressed her desire to see Mr. Materia on Valentine's Day.  Mr. Materia told her that he could not meet her. Enraged at his rejection, Ms. Summers sent a threatening email and phone message.  She informed him that he would regret his actions and that he would not be promoted.  Moreover, she indicated that he should consider his professional reputation ruined at DOL.

56. In or around March 2006, Mr. Materia met with Mr. McWilliam to discuss his concerns with his career and Ms. Summers' constant harassment.  Mr. McWilliam delayed meeting with Mr. Materia for weeks.  When they eventually met, Mr. McWilliam admitted to Mr. Materia that DOL officials believed that he and Ms. Summers were romantically involved, including the Agency Secretary, Mr. Ciccolella.  Mr. McWilliam then suggested that Mr. Materia leave DOL and offered to help him find another position.

57. On or about April 25, 2006, Mr. Materia met with an EEO counselor, Lillian Winstead, to discuss the harassment inflicted by Ms. Summers.

58. On or about June 28, 2006, Mr. Materia filed a formal complaint of discrimination.

59. As a result of filing a complaint with the EEO office, the Agency has repeatedly retaliated against Mr. Materia.

60. In or about October 2006, Mr. Materia met with his current program manager, Ronald Drach, and confided in him about Ms. Summers' harassment and asked for his help. Mr. Drach indicated that he did not want to discuss Mr. Materia's concerns about Ms. Summers and did not respond to Mr. Materia. In fact, he subsequently became distant and non-supportive.

61. On or about January 8, 2007, Mr. Materia was eligible for his career-ladder promotion. As such, he made a request that Mr. Drach consider him for promotion to a GS-12. Mr. Drach ignored his requests and, to this day, continues to ignore Mr. Materia's requests for promotion.

62. On or about December 1, 2006, the Agency informed Mr. Materia that his temporary assignment in Washington, D.C. would come to an end by the end of the month.

63. On or about December 1, 2006, the Agency posted a vacancy announcement for Mr. Materia's position. On or about December 20, 2006, Mr. Materia interviewed for the position.

64. In or about mid-December 2006, the Agency hosted a surprise party for Mr. Ciccolella. In an effort to ostracize Mr. Materia for his supposed relationship with Ms. Summers, Mr. Materia was excluded.

65. The following week, Mr. Ciccolella, Mr. McWilliam and Daniel Nicols, Agency Chief-of-Staff, treated Mr. Materia like a pariah and went out of their way to ignore him at the Agency's holiday party.

66. As a direct result of Ms. Summers' constant harassment, Mr. Materia suffered from Psoriasis which his physician indicated was stress related. He has numerous red scaly patches on his skin and suffers from joint pain.

67. Mr. Materia also suffered and still suffers from stress-related headaches, weight gain, weight loss, difficulty sleeping, anxiety and feelings of regret.

68. Mr. Materia sought the help of a counselor who diagnosed him with depression. Mr. Materia exhibited symptoms of isolation, betrayal feelings, distrust, guilt, avoidance issues, and fear.

69. Despite his excellent work, the Agency did not award Mr. Materia with a bonus for 2006.

70. Mr. Materia has not received any training to assist in his career growth.

71. On or about January 7, 2007, Mr. Materia's performance appraisal was due but the Agency refused to conduct it.

72. In or about January 2007, Mr. Materia's supervisor, Mr. Drach, threatened him with termination for no legitimate reason.

73. In or about January 2007, Mr. Drach retaliated against Mr. Materia by undermining his authority on a project on which he had become the lead contact person. Mr. Drach went so far as to send e-mails to Mr. Materia's colleagues instructing them not to take any direction from Mr. Materia.

74. In or about February 2007, the Agency informed Mr. Materia that the Veterans Employment Specialist position, for which he had applied and been deemed the best qualified for in November 2006, was inexplicably cancelled by the deciding official, Mr. Ciccolella.

75. On or about March 15, 2007, in retaliation for filing his complaint and in an effort to cause Mr. Materia embarrassment, Mr. Ciccolella singled Mr. Materia out at a meeting and refused to allow him to participate in a discussion regarding a program Mr. Materia had been managing for over nineteen months.

76. The Agency has refused to reimburse Mr. Materia for expenses he has incurred living in Washington, D.C., despite his repeated requests.

77. Despite repeated reassurances by the Agency to permanently assign Mr. Materia to Washington, D.C. before he filed his complaint, the Agency has kept Mr. Materia in a temporary status which adversely affects his quality of life and has left him in a constant state of flux.

78. On or about April 24, 2007, in an effort to harass Mr. Materia into resigning and in retaliation for filing his complaint, the Agency terminated Mr. Materia's temporary duty with REALifelines Program in Washington, D.C., a program on which he'd worked since his arrival in Washington, D.C., and instructed him to report back to Boston, Massachusetts.

## STATEMENT OF CLAIMS

**COUNT I:**    Sex Discrimination and *Quid Pro Quo* Sexual Harassment in Violation of Title VII:

79. Plaintiff re-allege paragraphs 1-78 and incorporates them fully herein.

80. Title VII prohibits employers and the Federal government from discriminating against its employees on the basis of sex. This prohibition includes sexual harassment and hostile work environment.

81. Plaintiff alleges that Defendant and/or agents or employees acting on its behalf, subjected him to *quid pro quo* sexual harassment.  Plaintiff further alleges that these acts and practices violate Title VII.

82. Plaintiff also alleges that as a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Plaintiff has suffered grievous harm to his career and continues to suffer such harm.  These injuries and losses include, but are not limited to, loss of promotion opportunities, loss of past and future salary, benefits and entitlements, loss of professional status and career-enhancing opportunities.

83. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Plaintiff has suffered emotional distress, humiliation, pain and anguish, as well as damage to his professional career and reputation.

84. As a consequence of Defendant's actions, Defendant is liable to Plaintiff for those damages as well as for attorneys' fees, the costs of this litigation, and accrued interest.

**COUNT II:**    Sex Discrimination and Hostile Work Environment in Violation of Title VII:

85. Plaintiff re-allege paragraphs 1-84 and incorporates them fully herein.

86. Title VII prohibits employers and the Federal government from discriminating against its employees on the basis of sex.  This prohibition includes sexual harassment and hostile work environment.

87. Plaintiff alleges that Defendant and/or agents or employees acting on its behalf, subjected him to a hostile work environment based on his sex.   Plaintiff further alleges that these acts and practices violate Title VII.

88. Plaintiff also alleges that as a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Plaintiff has suffered grievous harm to his career and continues to suffer such harm.  These injuries and losses include, but are not limited to, loss of promotion opportunities, loss of past and future salary, benefits and entitlements, loss of professional status and career-enhancing opportunities.

89. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Plaintiff has suffered emotional distress, humiliation, pain and anguish, as well as damage to his professional career and reputation.

90. As a consequence of Defendant's actions, Defendant is liable to Plaintiff for those damages as well as for attorneys' fees, the costs of this litigation, and accrued interest.

**COUNT III:**  Retaliation and Retaliatory Harassment in Violation of Title VII:

91. Plaintiff re-alleges paragraphs 1-90 and incorporates them fully herein.

92. Mr. Materia additionally alleges that Defendant, and/or agents or employees acting on its behalf, retaliated against plaintiff for engaging in protected activities by denying him employment opportunities, subjecting him to adverse and disparate treatment and harassment.  Mr. Materia further alleges that these acts

violate Title VII and that he has suffered and will continue to suffer severe emotional and mental distress and loss of employment opportunities and career advancement.

93. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Mr. Materia has suffered grievous harm to his career and continues to suffer such harm. These injuries and losses include, but are not limited to, loss of past and future salary, benefits and entitlements, loss of professional status and career-enhancing opportunities.

94. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Mr. Materia has suffered emotional distress, humiliation, pain and anguish, as well as damage to his professional career and reputation.

95. As a consequence of Defendant's actions, Defendant is liable to Mr. Materia for those damages as well as for attorneys' fees, the costs of this litigation, and accrued interest.

## RELIEF SOUGHT

WHEREFORE, Plaintiff respectfully requests this Court to:

A.    Enter judgment for Plaintiff against Defendant on all Counts.

B.    Declare that the conduct of Defendant is in violation of Title VII of the Civil Rights Act of 1964, as amended;

C.    Award Plaintiff equitable relief, such as back pay, front pay, future losses, loss of benefits, and other economic losses and entitlements retroactive to

the date of the unlawful action found to have occurred in this case;

D.    Order Defendant to award a permanent position to Plaintiff at the GS-Level and Step he would have obtained if he were not discriminated against;

E.    Enjoin Defendant from future discrimination against Plaintiff;

F.    Award Plaintiff compensatory damages for the injuries and losses that he suffered in an amount to be proved at trial;

G.    Order Defendant to pay all reasonable attorneys' fees, court costs, and expenses incurred by Plaintiff as a result of Defendant's actions and inactions, as well as pre-judgment and post-judgment interest; and

H.    Order such other equitable and legal relief as the Court deems necessary and appropriate.

## JURY DEMAND

Plaintiff requests a trial by a jury of his peers as to all claims set forth in this Complaint.

Dated: May 22, 2007

Respectfully submitted,

_____
Camilla C. McKinney, Esq.
DC Bar No.  448776
McKinney & Associates, PLLC
1100 Fifteenth Street, N.W., Suite 300
Washington, D.C.  20005
(202) 861-2934 (telephone)
(202) 517-9111 (facsimile)
Attorney for Plaintiff Joseph Materia

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**JOSEPH MATERIA**                               )
                                                    )
                              Plaintiff,          )
                                                    )
                  v.                              )    Civil Action No. 06-2251(RWR)
                                                    )
**ELAINE L. CHAO, SECRETARY**                   )
**UNITED STATES DEPARTMENT**                     )
**OF LABOR**                                      )
                                                    )
                              Defendant.          )
_____)


<u>**NOTICE OF AMENDED COMPLAINT**</u>


        Plaintiff Joseph Materia hereby respectfully provides notice of Plaintiff's First

Amended Complaint.  A Motion to Amend the Complaint is not required because the

Defendant has not yet filed a responsive pleading.  <u>See</u> FRCP 7(a), which defines a

pleading, and FRCP 7(b), which treats motions separately.  <u>See</u> <u>also</u> <u>Tahoe-Sierra</u>

<u>Preservation Council, Inc. v. Tahoe Regional Planning Agency</u>, 216 F.3d 764, 788 (9th

Cir. 2000)(a motion to dismiss is not a pleading); <u>Principal Health Care of Louisiana, Inc.</u>

<u>V. Lewer Agency, Inc.</u>, 38 F.3d 240, 244 (5th Cir. 1994)(a motion for summary judgment

is not a pleading).

Accordingly, Plaintiff is filing his First Amended Complaint pursuant to FRCP 15(a) which provides that a "party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served."


Dated:  May 22, 2007                    _____/s_____
                                        Camilla C. McKinney, Esq.
                                        McKinney & Associates, PLLC
                                        1100 Fifteenth Street, N.W., Suite 300
                                        Washington, D.C. 20005
                                        (202) 861-2934/(202) 517-9111 (fax)
                                        Attorney for Plaintiff Joseph Materia


## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of May, 2007, I caused a true and correct copy of the foregoing Notice of First Amended Complaint to be served electronically, via CM/ECF, to:


JUDITH A. KIDWELL
Assistant United States Attorney
555 4th Street, N.W., Room E4905
Washington, D.C. 20530
(202) 514-7250


                                        _____/s_____
                                        Camilla C. McKinney